**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------X

GARY G. JOHNSON,

                             Plaintiff,             **REPORT & RECOMMENDATION**

           -against-                    16 Civ. 1729 (CS) (PED)

COMMISSIONER OF SOCIAL SECURITY,

                          Defendant.

-------------------------------------------------------X

## I.    INTRODUCTION

      Plaintiff Gary G. Johnson ("Plaintiff," or "Claimant") brings this action pursuant to 42

U.S.C. § 405(g) challenging the decision of the Commissioner of Social Security ("Defendant"

or the "Commissioner") denying Plaintiff's application for disability insurance benefits ("DIB").

Dkt. 1.  The matter is before me pursuant to an Order of Reference entered January 6, 2016.  Dkt.

10.  Presently before this Court are the parties' cross-motions for judgment on the pleadings

pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, Dkts. 16 (Plaintiff's motion), 17

(Plaintiff's memorandum of law in support), 19 (Defendant's cross-motion), 20 (Defendant's

memorandum of law), 21 (Plaintiff's reply).  For the reasons set forth below, I respectfully

recommend that Defendant's cross-motion be **DENIED**, and that Plaintiff's cross-motion be

**GRANTED**.

## II.    BACKGROUND

      The following facts are taken from the administrative record ("R.") of the Social Security

Administration, Dkt. 12.

**A. Application History**

On January 9, 2013, Plaintiff filed a Title II application for DIB for a period of disability. R. 137-43. Plaintiff also filed a Title XVI application for supplemental security income ("SSI") on January 9, 2013. R. 144-49. In both applications, Plaintiff alleged disability beginning on December 30, 2007 ("Alleged Onset Date"). R. 71, 75. On May 1, 2013, Plaintiff was found disabled as of January 9, 2013 for his Title XVI claim. R. 83-84. Plaintiff filed a written request for a hearing on his DIB application on May 29, 2013 alleging that his disability began on December 30, 2007. R. 91-92, 127, 137-49, 161.

On June 24, 2014, the administrative law judge ("ALJ") held a video hearing. R. 25-69. Plaintiff appeared in Goshen, New York and the ALJ presided over the hearing from White Plains, New York. *Id.* On September 3, 2014, the ALJ issued a decision denying Plaintiff's DIB application. R. 25-39. On October 29, 2014, Plaintiff timely filed a Request for Review of a Hearing Decision/Order by the Appeals Council and a request to present new and material evidence. R. 22-24. On January 6, 2016, the Appeals Council denied Plaintiff's request for review. R. 1-9. On April 4, 2016, the Appeals Council granted Plaintiff's request for additional time to represent more information and further argument. R. 1. On July 19, 2016, the ALJ's decision became the Commissioner's final decision when the Appeals Council denied Plaintiff's request for review because it had not received any additional arguments or evidence for consideration and therefore "found no reason under our rules to review the Administrative Law Judge's decision." R. 1-4. Plaintiff filed this action on March 7, 2016. Dkt. 1.

Plaintiff was born on March 19, 1951. R. 70, 75. Plaintiff filed a claim for disability due to emphysema, high cholesterol, and osteoarthritis in the lower back. R. 70, 75, 164. He has not worked since his Alleged Onset Date. R. 71, 76.

## B. Medical History

### 1. Before Plaintiff's alleged onset date

#### a. 1997-2004

On June 30, 1997, a cervical spine magnetic resonance imaging scan ("MRI") showed moderate multilevel degenerative joint disease. R. 513. Less than two years later, a March 27, 1999 MRI of the lumbar spine showed partial disc degeneration of the L1-2 intervertebral disc and early degeneration of the L2-3, L3-4 and L4-5 intervertebral discs, all with lateral osteophyte (bone spurs) formation, and moderately advanced degeneration of the L5-S1 intervertebral disc, but no disc herniation or spinal stenosis (narrowing of the spinal canal). R. 514.

Almost three years later, in February 2002, Plaintiff ran out of his prescription for Vicodin and complained to Dr. James Gurniak of severe "10/10" non-radiating pain in his mid and lower back. R. 490. On March 6, 2002, a chest x-ray showed probable hyper-aeration (overinflation of the lung) but no acute pulmonary process. R. 515. More than four months later, on July 30, 2002, an MRI of Plaintiff's lumbar spine showed: at L1-2 moderate degenerative disc narrowing; at L5-S1 severe degenerative narrowing and broad-based posterior osteophyte and mild facet (joint) arthritis; at L3-4 and L4-5 early disc desiccation (dehydration); at L4-5 mild bulging of the disc annulus and mild facet arthritis. R. 516. The degenerative changes of the L1-2 and L5-S1 intervertebral discs at levels were unchanged since the 1999 MRI, and there was no focal disc herniation or canal or foraminal encroachment. R. 516. On September 27, 2002, Dr. Joseph Salerno wrote that Plaintiff had arthritis and chronic back pain confirmed by severe degenerative disc disease at several levels. R. 540. Dr. Salerno also wrote that he had counseled plaintiff to return to school for graduate studies and pursue a career that did not involve manual labor because Plaintiff would need to take prescription analgesics on a

3

regular basis to do such work and "as time goes on, he [would] require[] additional doses of such medication," and such work "might jeopardize [his] health and ability to function normally in the future." R. 540.

More than two years later, in October 8, 2004, an MRI of the lumbar spine showed "no significant change," mild scoliosis, disc degeneration advanced at L1-2 and L5-S1, no disc herniation, and no significant degrees of canal stenosis. R. 517, 539.

### b. 2006

On April 7, 2006, a computerized tomography ("CT") scan of Plaintiff's chest revealed an eight mm left lung nodule. R. 300, 323, 503. On April 25, 2006, a PET/CT examination showed that the lung nodule was not hyper-metabolic, and there was no evidence of increased metabolism in the neck, chest, abdomen, pelvis, or proximal thigh. R. 294, 325. On April 26, 2006, Plaintiff underwent spirometry testing,[1] R. 276-80, which showed "good efforts" pre-bronchodilator. R. 276. Plaintiff's forced expiratory volume for one second ("FEV1") was 114 percent of predicted, and his FEV1/(forced vital capacity ("FVC")) was 97 percent of predicted. R. 276.

On April 26, 2006, Dr. Leon Harris evaluated the recent CT and PET scans and noted that Plaintiff, who had been a heavy smoker for many years, denied fever chills, sweats, cough, and sputum, and could walk for three miles and climb two flights of stairs without difficulty. R. 301-02. Dr. Harris's review of systems was negative and his physical examination of Plaintiff

---

[1] Spirometry is a test used to assess how well your lungs work by measuring how much air you inhale, how much you exhale and how quickly you exhale in a bronchodilator. Spirometry is used to diagnose asthma, chronic obstructive pulmonary disease ("COPD") and other conditions that affect breathing. Mayo Clinic Staff, "Tests and Procedures, Spirometry," Mayo Clinic (July 11, 2014), available at http://www.mayoclinic.org/tests-procedures/spirometry/basics/definition/prc-20012673.

was unremarkable. R. 301. Although pulmonary function tests showed normal spirometry, they also showed low diffusion capacity (the transfer of gas from air in the lung to the red blood cells in lung blood vessels) of 51 percent of predicted. R. 302. As a result, Dr. Harris conducted an exercise oximetry, which showed that Plaintiff's oxygen saturation was good at rest but fell as low as 88 during exercise before returning to normal at the conclusion of the exercise. R. 302. Dr. Harris diagnosed Plaintiff with chronic obstructive pulmonary disease ("COPD") with low diffusion capacity and decrease in oxygen saturation during exercise. R. 302. Dr. Harris also advised that, despite the negative PET scan, the 8 mm left mid lung nodule in a heavy smoker "needs to be followed serially over 3 years" with CT scans. R. 302. On July 26, 2006, a chest CT scan showed a stable mid lung nodule and moderate-to-severe emphysematous disease involving both the upper and mid-lung fields. R. 288-89, 504.

### c. 2007

On February 3, 2007, Plaintiff complained of back pain to Dr. Henry C. Okere at Stat Health Medical Service. R. 486. Dr. Okere prescribed Oxycodone. R. 486, 538. A February 20, 2007 chest CT scan showed a stable pulmonary nodule with moderate-to-severe emphysematous disease unchanged since April 2006. R. 233-34, 235-36. On August 8, 2007, Plaintiff complained to Dr. Doug Schottenstein, a pain management specialist at Seaport Orthopaedic Associates, of back pain. R. 455, 457. Dr. Schottenstein performed a bilateral, selective nerve root injection at the L4 intervertebral disc and prescribed Oxycontin, Vicodin, Celebrex and physical therapy. R. 455, 457.

On August 29, 2007, Plaintiff continued to complain of back lower back pain and three weeks later at a follow-up appointment with Dr. Schottenstein, he received an epidural steroid injection with fluoroscopy at the L5-S1 intervertebral disc. R. 445-50. In September and

October 2007, Plaintiff returned to Dr. Schottenstein for back treatment for which he was prescribed Oxycodone-based medication and physical therapy. R. 430-40.

A September 9, 2007 MRI examination of Plaintiff's cervical spine showed multilevel degenerative disc disease with spondylosis and arthrosis of the joints at the C3-4 through C6-7 intervertebral discs, multilevel foraminal compromise bilaterally, and left-sided facet osteoarthritis at the C6-7 level, but no disc herniation, cervical cord compression, or spinal stenosis. R. 507. A September 19, 2007 MRI of Plaintiff's lumbar spine showed scoliotic curvature, degenerative disc disease with disc space narrowing at levels T12-L1, L1-2, and L5-S1, mild disc space narrowing at L4-5, and facet osteoarthritis at levels L4-5 and L5-S1, but no disc herniation, foraminal stenosis, spinal stenosis, spondylolysis, spondylolthesis, or any significant change from the 2004, MRI. R. 508. On November 26, 2007, Dr. Schottenstein performed a bilateral median nerve branch block at levels L3, L5 and S1 to address Plaintiff's lower back pain. R. 424-29. On December 12, 2007, Dr. Schottenstein performed a right lumbar medial branch radiofrequency ablation (a procedure used to reduce pain) at levels L3, L4, L5 and S1 to address Plaintiff's lower back pain. R. 413-22.

### 2. After Plaintiff's alleged onset date

On January 21, 2008, Dr. Schottenstein performed a left lumbar medial branch radiofrequency ablation at levels L3, L4, L5, and S1 to address Plaintiff's lower back pain. R. 407-12. On February 20, 2008, Dr. Schottenstein performed a bilateral sacroiliac joint steroid injection. R. 401-06.

A March 13, 2008 chest CT scan showed extensive interstitial disease peripherally in both lung fields when compared to the study conducted in February 2007 and showed that Plaintiff's left lung nodule measured 7 mm instead of 8 mm but revealed no other changes, and

no change in his COPD. R. 232, 509. A March 14, 2008 chest CT scan showed a stable left lung nodule and no change in the COPD when compared to February 2007. R. 281, 509. On March 19, 2008, Dr. Schottenstein performed a bilateral sacroiliac joint steroid injection. R. 395-400. On April 9 and 16, 2008, Dr. Schottenstein performed a right and a left sacroiliac joint radiofrequency ablation, respectively. R. 458, 459. On May 14, 2008, Dr. Schottenstein continued prescribing Plaintiff with Oxycodone even though Plaintiff reported that the last procedure had provided 50 percent pain relief. R. 390-94. On June 14, 2008, Plaintiff rated his pain as "8/10" but reported that medication was alleviating his pain. R. 385-89. On July 14, 2008, Plaintiff complained of mild lower back pain aggravated by sitting, standing and running, but reported that medications were alleviating his pain. R. 380-84. On August 13, 2008, Plaintiff rated his lower back pain as "8/10." R. 375-79. On August 25, 2008, Dr. Schottenstein performed a bilateral selective nerve root injection at level L4. R. 374.

On October 6, 2008, Plaintiff rated his lower back pain as "8/10." R. 359-63. On November 5, 2008, Plaintiff rated his lower back pain as "10/10." R. 364-368. On November 12, 2008, Dr. Schottenstein performed a lumbar discography at L3-L4, L4-L5, and L5-S1. R. 356-57. A November 12, 2008 CT scan of Plaintiff's lumbar spine showed multilevel disc disease and degenerative changes. R. 358. On November 17, 2008, Dr. Schottenstein noted that "Pt feels well." R. 355. On December 3, 2008, Plaintiff rated his lower back pain as "8/10." R. 349-53.

In January 2009 through March 2009, Plaintiff continued to rate his lower back pain as "8/10," R. 333, 339, 344, and Dr. Schottenstein continued refilling Plaintiff's prescriptions for Oxycodone and Celebrex. R. 336, 338, 342, 347. On March 30, 2009, Plaintiff complained of back pain that was aggravated by cold weather, lower extremity pain, and paresthesia (abnormal

sensation such as tingling, tickling, pricking, numbness or burning). R. 333. Plaintiff was diagnosed with lumbar radiculopathy, sacroiliac arthropathy and facet osteoarthritis. R. 336. At an April 27, 2009 appointment with Dr. Adam C. Carter at Downtown Physical Medicine & Rehabilitation, Plaintiff reported no change in his lower back symptoms and that his medication helped managed his symptoms, but on examination he continued to have painful and limited range of motion about the lumbar spine. R. 331. Dr. Carter diagnosed chronic low back pain and continued the prescriptions for Oxycodone and Celebrex. *Id.* In August, September and October 2009, Dr. Gurniak prescribed Tramadol and Ultram for Plaintiff's back pain. R. 483-85, 531, 535.

On July 11, 2012, Dr. Gurniak prescribed Ultram for Plaintiff's lower back pain. R. 481-82. A chest x-ray performed that day showed interstitial lung markings and evidence of hyperinflation. R. 238, 527. Dr. Gurniak diagnosed Plaintiff with chronic lower back pain, degenerative disc disease, osteoarthritis, and COPD. R. 481.

On January 7, 2013, Dr. Gurniak reviewed Plaintiff's blood work. R. 480. On February 26, 2013, Dr. Gurniak found that Plaintiff's lungs and heart were normal. R. 479. On May 10, 2013, Dr. Gurniak diagnosed Plaintiff with COPD, chronic low back pain, and degenerative disc disease. R. 478. In July, Plaintiff continued to complain of back pain, R. 476, 477, and Dr. Gurniak noted that an MRI showed disc narrowing and prescribed Percocet and Ultram. R. 476, 477. During monthly visits in August through December 2013, Plaintiff continued on Percocet and Ultram. R. 470, 471, 472, 473, 474, 475.

In February and March 2014, Plaintiff complained of achiness all over due to the weather and lower back pain, respectively, and continued his prescriptions for Ultram and Percocet. R. 466, 464. In April 2014, Dr. Gurniak saw Plaintiff for an upper respiratory infection. R. 462.

### a. Consultative Internal Medicine Examination

On April 16, 2013, Dr. Iftikhar Ali conducted a consultative internal medicine examination and found that lifting, bending, and rotating Plaintiff's back in certain directions made Plaintiff feel worse, the pain radiated to both hips when he walked more than 200 feet and then lasted up to thirty minutes, and was worse on the left side. R. 303-06. At the consultative examination, Plaintiff reported having low back pain since 1997 with an intensity of 5-8/10 that felt better with medication. R. 303. Plaintiff also reported having numbness in his feet for seven years that was not alleviated by medication, and shortness of breath due to emphysema since 2004 that was brought on by climbing one flight of stairs, walking up a hill or humidity, and otherwise worsened with exertion. *Id.* Plaintiff reported that he had smoked until 2005 and that his current medications included Oxycodone, Aspirin and Tramadol. R. 304. Plaintiff stated that he could cook, clean, do laundry, shop, shower, bathe, and dress himself, and spent his time watching TV, listening to the radio, reading, and socializing with friends. R. 304.

On examination, Plaintiff had a normal gait and stance, could walk on his heels and toes without difficulty, could perform a squat to 90 percent, could ambulate without assistive devices, needed no help changing for the examination or getting on and off the examining table, and was able to rise from a chair without difficulty. R. 304. Dr. Ali found that Plaintiff's ears, nose, throat, neck, chest, lungs, heart, musculoskeletal system, neurologic system and extremities were unremarkable and that Plaintiff had a full range of motion in the cervical and lumbar spine and all joints, no scoliosis, negative straight leg raising bilaterally, no sensory or strength deficits, no atrophy, intact hand and finger dexterity, and full grip strength bilaterally. R. 305. That day, Plaintiff also had normal spirometry and pulmonary function tests, and a lumbar spine x-ray, which showed thoracolumbar dextroscoliosis (curvature of the spine to the right) with

degenerative spondylosis/degenerative disc disease at L1-2, L2-3, L4-5 and L5-S1, and facet joint arthropathy. R. 305, 307-10. Dr. Ali diagnosed low back pain, numbness in the feet and shortness of breath, and reported that Plaintiff's prognosis was stable. R. 306. Based upon his physical examination, Dr. Ali opined that Plaintiff had no physical restrictions but that he should avoid respiratory irritants due to his history of emphysema. R. 306.

### C. Hearing Testimony

On June 24, 2014, Plaintiff appeared before the ALJ Robert Gonzalez represented by counsel, Gary J. Gogerty. R. 40-69. Plaintiff was 63 years old at the time of his administrative hearing. R. 45. Plaintiff testified he received a Master's degree from the Tri-State College of Acupuncture in Manhattan, New York. R. 45. At the hearing, Plaintiff submitted four pages of records from Dr. Kogen, a 2004 MRI from Dr. Salerno, and a handwritten narrative dated September 27, 2002. R. 43-44. Plaintiff testified that after his Alleged Onset Date he took a part-time job at the Middletown Physical Medicine and Rehabilitation performing acupuncture but was terminated for failing to satisfy the employer with the pace of his work. R. 46. Plaintiff testified that he did not get regular medical coverage because he was uninsured from 2007 until recently. R. 47. He testified that he received the most intensive care from Seaport Medical because "they tried a number of procedures on me for my back and had me on some very ... very intense medicine, Oxycodone 160 milligrams a day." R. 47. Plaintiff's ex-wife used to have health insurance until she was laid off during the 2008 economic crisis. R. 47. Plaintiff testified that he was seeing Dr. Schottenstein as a pain management doctor and Dr. Gurniak, who works out of a clinic and charged "only $85 for a visit." R. 48. Plaintiff testified that the reason there is a gap between his first visit with Dr. Gurniak and when he went to Seaport Orthopedics is that "there was no benefits, no work, and no way to get treatment." R. 49. The ALJ questioned

Plaintiff about his work history. R. 49. Plaintiff had self-employment earnings of $24,000 in 1999 and $22,000 in 2000 for running his remodeling business, which involved construction work, building bathrooms, installing kitchens, remodeling basements, installing cabinets. R. 49-50. Although a homeowner would typically contract their own tile person, when Plaintiff was remodeling bathrooms, he would have to take the vanity out, take the toilet bowl out, or take an old shower out. R. 51. He would do some of it and hire help for the rest of it. R. 51. Plaintiff testified that he did not have any earnings for 2002, 2003 and 2004 because he was at school for acupuncture. R. 51.

Plaintiff testified that on a typical day after he gets up in the morning, he usually takes medicine "because I really can't get going without it. And wait, you know, a couple hours until that kicks in, I take my dog out and walk her around the block, come back, have something to eat." R. 52. He testified that he hates waking up because he is hurting on a scale of 7 or 8 out of 10 and cannot function until the medication kicks in. R. 52. After a couple hours, Plaintiff testified his pain would lessen to a 4 or 5 out of 10 because "it's always hurting." R. 52. Plaintiff testified that when he walks around the block, he suffers from shortness of breath, his legs feel heavy, and he feels like he doesn't have any strength. R. 53-54. Plaintiff uses an inhaler for his shortness of breath. R. 54. Plaintiff testified that three of his lumbar discs are basically gone entirely and the rest are "like crushed raisins." R. 54-55. Plaintiff testified that his symptoms were burning pain that goes into his hips and down his legs and his right foot is always numb. R. 55. He cannot pick anything up because it causes too much pain to his back. R. 56. Plaintiff testified that beginning in 2007 and 2008, he could not be on task for the eight-hour day. R. 58. Plaintiff testified that he is unable to work "[n]ot because he didn't want to work, but I can't. I just can't do it." R. 58.

Plaintiff testified that he had a number of unsuccessful procedures meant to deaden his nerves to pain. R. 58-59. He also had a couple of cortisone injections that helped "some." R. 59. Plaintiff testified that his pain management was largely through prescription drugs. R. 59.

### D. Vocational Expert Testimony

A vocational expert, Ms. Pomeroff, testified at Plaintiff's June 24, 2014 administrative hearing. R. 61-69. The ALJ asked the vocational expert to consider hypothetically whether a person of Plaintiff's age, education, and work experience, who was able to perform a full range of medium work with the following additional limitations: "The person can only frequently stoop and must avoid concentrated exposure to dust, fumes, and noxious gases," would be able to perform Plaintiff's past work. R. 61-69. The vocational expert found that Plaintiff would still be able to perform the acupressurist position, *Dictionary of Occupational Titles* (4th ed. Rev'd 1991) ("DOT"), Job Code 079.271-014, medium SVP 5, skilled. R. 63-64, but would be precluded from performing his past house repair work. R. 64. The vocation expert testified that such an individual would be able to perform the following positions: (i) dining room attendant, DOT Code 311.677-018, of which there are 110,000 jobs in the national economy; (ii) sandwich maker, DOT Code 317.664-010, of which there are 100,000 jobs in the national economy; (iii) patient transporter, DOT Code 359.677-014, of which there are 38,000; and (iv) merchandise delivered, DOT Code 299.477-010, of which there are 100,000 jobs in the national economy. R. 64-65.

## III.   THE ALJ'S DECISION

The ALJ issued a decision on September 3, 2014 following the standard five-step inquiry used for determining disability. R. 28-36. In the first step of the inquiry, the ALJ determined

that Plaintiff had not performed substantial gainful activity since the December 30, 2007 alleged onset date. R. 30.

At step two, the ALJ next found that Plaintiff's medical issues — emphysema, osteoarthritis, lumbar and cervical degenerative disc disease and scoliosis — rose to the level of "severe." R. 31.

At step three, further considering the medical severity of Plaintiff's impairments, the ALJ decided that Plaintiff did not meet or medically equal the "Appendix 1" impairments, which compel a finding of disability. R. 31.

At step four, the ALJ considered "the entire record" and made a finding about Plaintiff's residual functional capacity. R. 31. The ALJ found that "the claimant retained the residual functional capacity to perform a medium work as defined in 20 C.F.R. 404.1567(c) and 416.967(c) except the claimant was limited to frequently stooping and no concentrated exposure to dust fumes and noxious gases." R. 31. In making this determination, the ALJ considered "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence…" R. 31.

The ALJ found that "the claimant's medically determinable impairments could have reasonably been expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." R. 32. In making this determination, the ALJ explained, "the claimant has described daily activities that are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations…treatment has been essentially routine and/or conservative in nature … the record does not contain any opinion from treating or examining physicians indicating that the claimant was disabled during the relevant period … claimant's work history

shows that claimant worked only sporadically prior to the alleged disability onset date, which raises the question as to whether the claimant's continuing unemployment was actually due to the medical impairments." R. 32-35.

In making the residual functional capacity determination, the ALJ also considered: (i) the treatment notes and opinions from Plaintiff's physician, Dr. Joseph Salerno, R. 32; (ii) CT scans, (iii) PET scans; (iv) MRI studies; (v) treatment records from Downtown Physical Medicine and Rehabilitation; (vi) treatment notes and opinion evidence from Dr. Doug Schottenstein; (vii) treatment notes and opinions from Dr. James Gurniak; and (viii) treatment and opinion evidence from consultative examiner, Dr. Iftikhar Ali. R. 34.

The ALJ gave "great weight" to the opinion of the consultative examiner, Dr. Ali, because it was "well supported by the physical examination findings, the clinical and diagnostic evidence of record, the conservative treatment history, as well as the claimant's own testimony regarding his full activities of daily living." R. 34. The ALJ did not specify the weight he accorded Dr. Salerno or Dr. Gurniak's opinions.

After making the above findings, the ALJ considered whether the claimant would be able to perform any past relevant work and found that "claimant was capable of making a successful adjustment to other work that existed in significant numbers in the national economy." R. 35-36.

Following these conclusions, the ALJ reached the end of the five-step process, determined that Plaintiff was not disabled, and denied his application. R. 36.

## IV.    LEGAL STANDARD

### A.    Standard of Review

In reviewing a decision of the Commissioner, a district court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision

of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "It is not the function of a reviewing court to decide de novo whether a claimant was disabled." *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999). Rather, the court's review is limited to "determin[ing] whether there is substantial evidence supporting the Commissioner's decision and whether the Commissioner applied the correct legal standard." *Poupore v. Astrue*, 566 F.3d 303, 305 (2d Cir. 2009) (per curiam).

The substantial evidence standard is "even more" deferential than the 'clearly erroneous' standard. *Brault v. Social Sec. Admin*, 683 F.3d 443, 448 (2d Cir. 2012). The reviewing court must defer to the Commissioner's factual findings, and the Commissioner's findings of fact are considered conclusive if they are supported by substantial evidence. *See* 42 U.S.C. § 405(g). "Substantial evidence" is "more than a mere scintilla" and "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Lamay v. Commissioner of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009) (internal quotations omitted) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "In determining whether the agency's findings are supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (internal quotations omitted). "When there are gaps in the administrative record or the ALJ has applied an improper legal standard," or when the ALJ's rationale is unclear in light of the record evidence, remand to the Commissioner "for further development of the evidence" or for an explanation of the ALJ's reasoning is warranted. *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996).

B. **Statutory Disability**

A claimant is disabled under the SSA when he or she lacks the ability "to engage in any

substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A). In addition, a person is eligible for disability benefits under the SSA only if:

> his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.
> *Id.* § 423(d)(2)(A).

A claimant's eligibility for SSA disability benefits is evaluated pursuant to a five-step sequential analysis:

1. The Commissioner considers whether the claimant is currently engaged in substantial gainful activity.

2. If not, the Commissioner considers whether the claimant has a "severe impairment" which limits his or her mental or physical ability to do basic work activities.

3. If the claimant has a "severe impairment," the Commissioner must ask whether, based solely on medical evidence, claimant has an impairment listed in Appendix 1 of the regulations. If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocational factors such as age, education, and work experience.

4. If the impairment is not "listed" in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has residual functional capacity to perform his or her past work.

5. If the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work which the claimant could perform.

*Rolon v. Commissioner of Soc. Sec.*, 994 F. Supp. 2d 496, 503 (S.D.N.Y. 2014); *see* 20 C.F.R. §§ 404.1520(a)(4)(i)–(v), 416.920(a)(4)(i)–(v). The claimant bears the burden of proof as to the first four steps of the process. *See Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir.

2003). If the claimant proves that his impairment prevents him from performing his past work, the burden shifts to the Commissioner at the fifth and final step. *See id.* At the fifth step, the Commissioner must prove that the claimant is capable of obtaining substantial gainful employment in the national economy. *See Butts v. Barnhart*, 416 F.3d 101, 103 (2d Cir. 2005); 20 C.F.R. § 404.1560(c)(2).

## V. ASSESSING THE ALJ'S FINDINGS

### A. Treating Physician Rule

Plaintiff argues that the ALJ misapplied the treating physician rule by failing to consider Dr. Salerno's opinion or evaluate any relevant factors under 20 C.F.R. § 404.1527 (c)(2)-(6). P. Mem. at 10-15 (citing *Merriman v. Colvin*, No. 14 Civ. 3510, 2015 U.S. Dist. LEXIS 124691, at *15 (S.D.N.Y. Aug. 14, 2015). Defendant contends that the ALJ properly applied the treating physician rule because the ALJ was not required to award controlling weight to Dr. Salerno's 2002 opinion since (i) it preceded the alleged disability onset date by five years, R. 540; and (ii) it was not an "opinion" but rather, speculation that if Plaintiff continued unspecified manual labor, Plaintiff's health *might* deteriorate, *Stottlar v. Colvin*, No. 13 Civ. 00047, 2014 U.S. Dist. LEXIS 111937, at *48 (N.D.N.Y. Aug. 13, 2014). D. Mem. at 12, 21-23.

Plaintiff also argues that the ALJ erred in failing to specify what weight, if any, he gave to Dr. Gurniak. P. Mem. at 14-15. Defendant responds simply that the ALJ accurately described Dr. Gurniak's records and the record contained sufficient other evidence supporting the ALJ's determination. D. Mem. at 23.

When considering the record evidence, the ALJ must give deference to the opinions of a claimant's treating physician. A treating physician's opinion will be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is

not inconsistent with the other substantial evidence in . . . [the] record." 20 C.F.R. §

416.927(c)(2); *see also Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000). Before an ALJ can

give a treating physician's opinion less than controlling weight, the ALJ should consider the

following factors to determine the amount of weight the opinion should be given: (1) the length

of the treatment relationship and the frequency of examination, (2) the nature and extent of the

treatment relationship, (3) the medical support for the treating physician's opinion, (4) the

consistency of the opinion with the record as a whole, (5) the physician's level of specialization

in the area, and (6) other factors that tend to support or contradict the opinion. 20 C.F.R. §

416.927(c)(2)-(6); *Schisler v. Sullivan*, 3 F.3d 563, 567 (2d Cir. 1993). Although the foregoing

factors guide an ALJ's assessment of a treating physician's opinion, the ALJ need not expressly

address each factor. *Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013) (summary order)

("We require no such slavish recitation of each and every factor where the ALJ's reasoning and

adherence to the regulation are clear.")(citing *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir.

2004) (per curiam)). As long as the ALJ provides "good reasons" for the weight accorded to the

treating physician's opinion and the ALJ's reasoning is supported by substantial evidence,

remand is unwarranted. *See Halloran v. Barnhart*, 362 F.3d 28, 32-33 (2d Cir. 2004).

### 1. Dr. Salerno

Plaintiff argues that the ALJ erred by substituting his own lay interpretation of diagnostic

tests even though Dr. Salerno is better suited to opine on the subject. P. Mem. at 13-15 (citing

*Balsamo v. Chater*, 142 F.3d 75, 80-81 (2d Cir. 1998); *Meadors v. Astrue*, 370 Fed. App'x. 179,

183 (2d Cir. 2010)). Defendant, on the other hand, contends that the ALJ did not impermissibly

substitute his own lay opinion because the record contained sufficient other evidentiary support

of the ALJ's determination and because the ALJ weighed all of that evidence when making his

RFC determination. D. Mem. at 23. Plaintiff's argument fails because Plaintiff complains of the ALJ's recitation of Dr. Salerno's own words, which does not constitute a "substitution of his own lay interpretation of a diagnostic test."

Plaintiff then argues that the ALJ improperly applied the treating physician rule to Dr. Salerno's opinions because he limited his consideration of Dr. Salerno's medical opinion evidence to the following sentences: "[a]lthough there is no evidence of any treatment, two years later, [an] October 8, 2004 MRI study noted complaints of persistent worsening non-radicular back pain. However, the study showed only mild scoliosis and disc degeneration, most advanced at L1-2 and L5-S1, with no disc herniation or canal stenosis." P. Mem. at 12 (citing R. 32-33). Plaintiff mischaracterizes the ALJ's analysis of Dr. Salerno's medical opinion evidence because the ALJ did in fact address Dr. Salerno's other opinions and treatment records. In particular, the ALJ explicitly considered Dr. Salerno's September 27, 2002 letter and opinion that Plaintiff's July 30, 2002 lumbar spine MRI showed severe degenerative disc disease at several levels and that Plaintiff should consider graduate school instead of pursuing jobs involving manual labor — both records were cited in Plaintiff's brief as omitted from the ALJ's analysis. R. 32 (referencing R. 540). Moreover, Dr. Salerno's 2002 opinions preceded the alleged onset date. Indeed, there is no evidence that Dr. Salerno treated Plaintiff during the relevant period at all. *Arnone v. Bowen*, 82 F.2d 34, 40-41 (2d Cir. 1989) (declining to require the application of the treating physician rule when there is no indication that the physician saw claimant during the relevant period). Given that Dr. Salerno did not treat Plaintiff during the relevant period, the ALJ was not required to further consider Dr. Salerno's opinions and treatment records. Therefore, the ALJ properly considered Dr. Salerno's medical opinion evidence.

Accordingly, the ALJ did not err in his application of the treating physician rule with respect to Dr. Salerno.

### 2. Dr. Gurniak

Plaintiff also claims that the ALJ erred in his application of the treating physician rule because he failed to specify what, if any, weight he gave Dr. Gurniak's opinion. P. Mem. at 14-15 (citing R. 33).

"Even when a treating physician's opinion is not given "controlling" weight, the regulations require the ALJ to consider several factors in determining how much weight it should receive." *Burgess v.* Astrue, 537 F.3d 117, 129 (2d Cir. 2008); *Pines v. Comm'r of Soc. Sec.*, No. 13 Civ. 6850, 2015 U.S. Dist. LEXIS 27325, at *23 (S.D.N.Y. Mar. 2, 2015) ("Due to the importance of the treating physician rule, the Second Circuit has made clear that it will 'not hesitate to remand when the Commissioner has not provided good reasons for the weight given to a treating physician's opinion and it will continue remanding when it encounters opinions from ALJ's that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion.") (alterations omitted) (quoting *Halloran*, 362 F.3d at 33).

Here, the ALJ dismissed Dr. Gurniak's opinion in a single sentence: "Dr. Furniak's [sic] treatment reports are rather vague and do not indicate any developments in the claimant's condition or specific treatment modalities other than pain medication management (Exhibit 6F, pp. 14-19)." R. 33. The Second Circuit has made clear that it will "not hesitate to remand when the Commissioner has not provided good reasons for the weight given to a treating physician's opinion." *Pines v. Comm'r of Soc. Sec.*, No. 13 Civ. 6850, 2015 U.S. Dist. LEXIS 27325, at *23 (S.D.N.Y. Mar. 2, 2015) (alterations omitted) (quoting *Halloran*, 362 F.3d at 33). The ALJ's conclusory statement not only fails to provide good reasons for discounting Dr. Gurniak's

opinions, it fails to specify what weight, if any, was awarded to the doctor's opinions. This was

error. Although Defendant argues that the ALJ "possessed a complete medical history and no

further development was required," D. Mem. at 23, "'legal error is cause for remand, even if

substantial evidence exists to support the Commissioner's factual findings.'" *Oomen v.*

*Berryhill*, No. 16 Civ. 3556, 2017 U.S. Dist. LEXIS 58319, at *36-37 (S.D.N.Y. Apr. 17, 2017).

Therefore, the ALJ's failure to specify how much weight he awarded Dr. Gurniak's opinion is

cause for remand.[2]

Accordingly, the ALJ improperly applied the treating physician rule with respect to Dr.

Gurniak. I respectfully recommend that remand is warranted on this basis.

## B. Duty to Develop the Record

Plaintiff next argues that the ALJ failed to develop the record to address a gap in the

medical record. P. Mem. at 10-15. Defendant counters the medical record was not incomplete

under 20 C.F.R. § 404.1513(b)(6). D. Mem. at 22 (citing *Tankisi v. Comm'r of Soc. Sec.*, 521

Fed. App'x. 29, 34 (2d Cir. 2013); R. 67-68).

It is well-settled that the ALJ has an affirmative obligation to develop the record. *See*

*Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009). "This means that the ALJ should make an

initial request from the claimant's treating physician for records, plus one follow-up request.

Thereafter, if the documents received lack any necessary information, the ALJ should re-contact

---

[2]     It appears likely that the ALJ's cursory treatment of Dr. Gurniak is related to the
fact that Dr. Gurniak's handwritten treatment records are largely indecipherable. *See* R. 479
(February 26, 2013); 478 (May 10, 2013); 476 (July 31, 2013); 475 (August 23, 2013); 474
(September 16, 2013); 473 (October 11, 2013); 472 (November 8, 2013); 471 (December 2,
2013); 470 (December 27, 2013); 468 (January 24, 2014); 466 (February 19, 2014); 464-65
(March 19, 2015); 462 (April 7, 2014); 460 (April 28, 2014). In such circumstances the ALJ
should to seek clarification or even transcription of the treating doctor's notes. *See Silva v.*
*Colvin*, No. 14 Civ. 6329, 2015 U.S. Dist. LEXIS 120739 at *15 (W.D.N.Y. Sept. 10,
2015)(remanding for transcription of doctor's illegible notes)(collecting cases).

the treating physician." *Velez v. Colvin*, No. 14 Civ. 3084, 2017 U.S. Dist. LEXIS 57670, at

*55-56 (quotation marks and citations omitted); *see also* 20 C.F.R. §§ 404.1512(b)(1),

419.012(b)(1). "To be sure, the ALJ's general duty to develop the administrative record applies

even where the applicant is represented by counsel, but the agency is required affirmatively to

seek out additional evidence only where there are 'obvious gaps' in the administrative record."

*Eusepi v. Colvin*, 595 Fed. App'x 7, 9 (2d Cir. 2014) (citation omitted). However, where there

are no "obvious gaps" in the record and where the ALJ already "possesses a complete medical

history," the ALJ is "under no obligation to seek additional information in advance of rejecting a

benefits claim." *Swiantek v. Comm'r of Soc. Sec.*, 588 F. App'x 82, 84 (2d Cir. 2015) (summary

order) (quoting *Rosa v. Callahan*, 168 F.3d at 79 n.5).

In Plaintiff's brief, he recites the contents of the records from Downtown Physical

Medicine and Rehabilitation in some detail and concludes, "[i]t is hereby submitted that ALJ

Gonzales failed to develop the record in this instance," P. Mem. at 12-13, without specifying

what the ALJ failed to develop. There is no obvious gap in this record. The ALJ had a complete

medical record before him. The only "gap" in the medical record after the Alleged Onset Date is

not due to missing records, as Plaintiff suggests, P. Mem. at 14, but rather, due to Plaintiff's

financial distress and lack of insurance, the absence of medical treatment. R. 22.

Accordingly, the ALJ was not under any further obligation to develop the record in this

instance. Remand is not warranted on this basis.

### C. Credibility

Plaintiff argues that the ALJ erred in making his credibility determination. P. Mem. at

15-17. In particular, Plaintiff argues that the ALJ did not clarify which of Plaintiff's daily

activities are not limited to the extent one would expect. P. Mem. at 15-17 (citing R. 34).

Defendant contends that the ALJ properly considered the extent to which there were conflicts between Plaintiff's daily activities and Plaintiff's statements about his alleged disability. D. Mem. at 17-18 (citing R. 34).

While it is true that an ALJ is required to consider the plaintiff's reports of pain and other limitations, 20 C.F.R. § 416.929, an ALJ is not required to accept the plaintiff's subjective complaints without question. *McLaughlin v. Sec'y of Health, Educ. & Welfare*, 612 F.2d 701, 704-05 (2d Cir. 1980). In assessing Plaintiff's subjective claims of pain and other symptoms, the ALJ must first determine whether there are "medically determinable physical or mental impairment(s) — i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques — that could reasonably be expected to produce the individual's pain or other symptoms." SSR 96-7p.[3] If this has been shown, the ALJ must then evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. *Id.* When making a credibility determination, the ALJ can consider the following factors: (1) daily activities; (2) the location, duration, frequency, and intensity of the pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any

---

[3]     Effective on March 28, 2016, SSR 16-3p, 2016 SSR LEXIS 4 superseded SSR 96-7p, 1996 SSR LEXIS 4. *See* SSR 16-3p, 2016 SSR LEXIS 4 (Mar. 28, 2016). The new ruling eliminates the use of the term "credibility" from the SSA's sub-regulatory policy, in order to "clarify that subjective symptom evaluation is not an examination of an individual's character." 2016 SSR LEXIS 4, at *1. Instead, adjudicators are instructed to "consider all of the evidence in an individual's record when they evaluate the intensity and persistence of symptoms after they find that the individual has a medically determinable impairment(s) that could reasonably be expected to produce those symptoms." 2016 SSR LEXIS 4, at *2. Both the two-step process for evaluating an individual's symptoms and the factors used to evaluate the intensity, persistence and limiting effects of an individual's symptoms remain consistent between the two rulings. *Compare* SSR 96-7p, 1996 SSR LEXIS 4 with SSR 16-3p, 2016 SSR LEXIS 4. As the ALJ's decision in this matter was issued before the new regulation went into effect, this Court reviews the ALJ's credibility assessment under the earlier regulation.

medication taken to alleviate pain or other symptoms; (5) treatment, other than medication, received for relief of pain or other symptoms; (6) any measures used to relieve pain or other symptoms; and (7) other factors concerning functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 416.929(c)(3). An ALJ is not required to explicitly address each of the regulatory credibility factors. *Cichoki v. Astrue*, 534 Fed. App'x 71, 76 (2d Cir. 2013) (summary order). If after considering these factors the ALJ's findings "are supported by substantial evidence… the court must uphold the ALJ's decision to discount plaintiff's subjective complaints of pain." *Aponte v. Sec'y, Dep't of Health and Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984). Ultimately, the ALJ's determination of credibility is entitled to deference. *See Snell v. Apfel*, 177 F.3d 128, 135-36 (2d Cir. 1999) ("After all, the ALJ is in a better position to decide issues of credibility").

Plaintiff's argument that the ALJ erred in assessing Plaintiff's credibility by failing to specify which of Plaintiff's described daily activities are not limited to the extent one would expect, P. Mem. at 15-17, ignores the other factors supporting the ALJ's credibility determination. R. 34. The ALJ came to his credibility determination after considering the several factors *collectively*: (i) "the claimant described daily activities that are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations; (ii) Plaintiff's treatment was "essentially routine and/or conservative in nature"; (iii) "the record does not contain any opinion from treating or examining physicians indicating that the claimant was disabled during the relevant period"; and (iv) the "claimant worked only sporadically prior to the alleged disability onset date, which raises the question as to whether claimant's continuing unemployment was actually due to the medical impairments." R. 34. Therefore, the ALJ's failure to itemize each activity of daily living that conflicts with Plaintiff's alleged disabling

condition does not undermine the ALJ's ultimate credibility determination.

Moreover, the record supports the ALJ's finding that Plaintiff reported activities of daily living that did not demonstrate a complete inability to work. For example, despite Plaintiff's allegedly disabling emphysema and back condition, Plaintiff reported activities of daily living such as cooking "simple" meals for himself daily; performing light garden work that consisted of planting seeds, pulling weeds, and harvesting tomatoes in a pail; shopping at stores for food and clothing three times per week on his own; caring for indoor and outdoor plants; walking his dog every day; visiting a friend every week or two; regularly walking to a park near the condo; and repairing some items around the house. R. 175-78. Plaintiff similarly reported to Dr. Ali that he cooked, cleaned, did laundry, shopped, watched television, listened to the radio, read books, and socialized with friends. R. 303; 20 C.F.R. § 404.1529(c).

Plaintiff argues that the ALJ also erred in making his credibility determination by noting that Plaintiff's treatment was essentially routine and/or conservative in nature and thereby substituting his own lay opinion for other competent medical opinions before him. P. Mem. at 18 (citing *Primes v. Colvin*, No. 15 Civ. 6431, 2016 U.S. Dist. LEXIS 14287, at *4 (W.D.N.Y. Feb. 5, 2016)). This argument is unavailing. The Social Security Regulations include (i) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; (ii) treatment, other than medication, received for relief of pain or other symptoms; and (iii) any measures used to relieve pain or other symptoms as factors to be considered before making a credibility determination. 20 C.F.R. § 416.929(c)(3). Thus, the ALJ properly considered the essentially routine and/or conservative nature of Plaintiff's treatment.

In light of the foregoing, the ALJ's credibility determination was supported by substantial evidence. On this record, I recommend that the Court decline to disturb the ALJ's credibility

finding.

### D. Substantial Evidence

Plaintiff argues that the ALJ improperly determined Plaintiff's RFC because he failed to cite any medical evidence or medical opinions in support of his RFC determination. P. Mem. at 19-22. Since the ALJ's RFC determination was improperly made, Plaintiff argues, the hypotheticals (based on the ALJ's RFC determination) proffered to the vocational expert were also improper. P. Mem. at 19-22. Defendant argues that since the ALJ's RFC determination actually *was* supported by substantial evidence, the hypotheticals proffered to the vocational expert were appropriate. D. Mem. at 19 (citing R. 31-35).

"Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). The ALJ is entitled to rely on both what the medical record says and what it does *not* say. *Dumas v. Sweiker*, 712 F.2d 1545, 1553 (2d Cir. 1983); *Johnston v. Colvin*, No. 13 Civ. 2710, 2015 U.S. Dist. LEXIS 20178, at *12 n.3 (S.D.N.Y. Feb. 13, 2015) ("As the Second Circuit has noted the absence of evidence from the claimed period of disability may itself be considered substantial evidence").

### 1. Emphysema

Contrary to Plaintiff's claim that "ALJ Gonzales offers no citation to the record as to medical evidence in support of his RFC determination," P. Mem. 22, the ALJ considered and cited directly to several treatment records for Plaintiff's allegedly disabling emphysema from 2007 through late 2012. R. 32. Beginning chronologically, the ALJ considered Dr. Salerno's April 2006 report which indicated that (i) Plaintiff denied symptoms often associated with the

condition, such as wheezing, cough or sputum, headaches, weight loss or hemoptysis (coughing blood); (ii) Plaintiff could walk three miles and negotiate two flights of stairs without difficulty; (iii) the pulmonary function test, performed at the time of the examination, showed normal spirometry with an FEV1 114%, low diffusion capacity, and a fall in O2 saturation with exercise; and (iv) Dr. Salerno's failure to recommend further treatment. R. 32 (citing Ex. 4F, pp. 11-13, Exhibit 4F, pp. 4-5). The ALJ next considered Plaintiff's February 2007 chest CTs, which showed moderate to severe emphysematous changes as stable, with no changes to the nodule as compared to the July 2006 study. R. 32 (citing Exhibit 1F, pp. 5-6) and Plaintiff's March 31, 2008 CT scan, which also showed a stable left lung nodule and no COPD when compared to the February 2007 study. R. 32 (citing Exhibit 6F, p. 65).

In my view, the ALJ cogently set forth the substantial evidence relied upon in determining Plaintiff emphysema was not disabling.

### 2. Back Condition

The ALJ's analysis of the record concerning Plaintiff's back condition, on the other hand, is problematic due to the ALJ's perfunctory discussion of Dr. Gurniak, who treated Plaintiff extensively for his back pain. "[A]n ALJ's failure to follow the procedural requirement of identifying the reasons for discounting . . . opinions and for explaining precisely how those reasons affected the weight given denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based on the record." *Silva v. Colvin*, No. 14 Civ. 6329, 2015 U.S. Dist. LEXIS 120739 at *14 (W.D.N.Y. Sept. 10, 2015)(quotations and citations omitted). Because I recommend remand for additional findings related to Dr. Gurniak, I do not reach the question whether the ALJ's determination that Plaintiff's back condition was not disabling was supported by substantial evidence.

## VI.    CONCLUSION

For the foregoing reasons, I respectfully recommend that Defendant's cross-motion be **DENIED** and that Plaintiff's cross-motion be **GRANTED** to the extent that this case should be remanded to the Commissioner for further administrative proceedings consistent with this Report and Recommendation.

Dated:  August 23, 2017
        White Plains, New York

Respectfully submitted,

Paul E. Davison, U.S.M.J.

## NOTICE

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report and Recommendation to serve and file written objections. *See also* FED. R. CIV. P. 6(a).  Such objections, if any, along with any responses to the objections, shall be filed with the Clerk of the Court with extra copies delivered to the chambers of the Honorable Cathy Seibel, at the Honorable Charles L. Brieant Jr. Federal Building and United States Courthouse, 300 Quarropas, Street, White Plains, New York 10601, and to the chambers of Judge Paul E. Davison at the same address.

Failure to file timely objections to this Report and Recommendation will preclude later appellate review of any order of judgment that will be entered.

Requests for extensions of time to file objections must be made to Judge Seibel.